Mr. Justice James
delivered the opinion of the court.
The declaration in this case alleges, substantially, the plaintiffs were retained by the State to aid by legal proceedings, mainly before the Supreme Court United States, in the recovery of certain bonds, proceeds thereof, in the possession of certain persons out right, and belonging to said State, upon a contii^^H compensation of twenty per centum of the amount of^^H of the said bonds or proceeds as might, by means of ’ aid, be in any way recovered by said State; that plaintiffs were acting under that retainer and conducti^H those proceedings, the defendant, with plaintiff‘s\consei^B was retained by said State as her other and further attorn^H and counsel, but upon a separate and' additional compen^B
*396 tion to be paid him, to aid in the recovery and collection of said bonds or proceeds ; that afterwards, and while plaintiffs and 'defendant were respectively so employed, the defendant, with the consent of said State, and in consideration that plaintiffs would, by means of their legal proceedings, cause the title of saicLState to said bonds to be therein adjudged and decreed ; bra/would, with the consent of the State, refrain from any attempt to reduce them into possession, and suffer the defendanjjwith like consent, to reduce them into possession for said StateTagreed with plaintiffs that he would retain for their sole nse, and pay over to them, out of any of the said bonds or proceeds thereafter collected or recovered by him, as such other attorney, into his actual possession; twenty per centum thereof; that plaintiffs, with the consent of the State, and by means of their proceedings before the Supine Court, did procure the title of the State to be adjudged as required, and did refrain as agreed, and did, with like consent, permit defendant alone, as such other attorney, to reduce said bonds into actual possession for the State ; and defendant did, by means of the adjudication procured by plaintiffs, and by force of such refraining and possession of the plaintiffs, recover into his actual posses-session for the said State, proceeds of said bonds to the amount of $339,240.12, but did not retain for the use of, or ■^y o /er to the plaintiffs twenty per centum, or any part of BBjtmroceeds, to the damage of plaintiffs in the sum of To this are added the common counts for money by defendant to plaintiffs, and money received by ^^^Hant for the use of plaintiffs.
^Hnr the sake of more intelligible brevity, it may be re-Hu that the cause of action set forth in the special is a breach of defendant’s promise to retain and pay ■Mirto plaintiffs, out of moneys which should be, and which ■Bally were collected by him, the fee -which the State of Has had agreed to pay them ; the consideration for this |H¡>mise being the performance of certain services by them, HHt their forbearance to perform themselves, and their suf-H^g defendant to perform certain other services.
*397 Four bills of exception were signed at the trial, but all of them are, in proper form, made part of the last one, and the hearing in this court has been upon the latter only. It shows that “ after the evidence had been given as set forth in the foregoing bills of exception, * * * the plaintiffs announced that they rested their case. Thereupon the defendant prayed the court to instruct the jury that upon the whole evidence their verdict should be for the defendant.” The bill further sets forth certain reasons on which the court based its conclusions, and then adds : “And the court, therefore, gave to the jury the instruction prayed, and the jury, under instruction, returned a verdict ?br'the defendant.”
It is not stated in terms that the bills of exception contain the “ whole ” of the evidence admitted at the trial; but a statement that the plaintiffs rested their case “ after the evidence had been given as set forth in the foregoing bills ” may be accepted as equivalent, besides, a presumption that other evidence was given by the plaintiffs would be a presumption against the decision of the court ; in other words, that error had been committed ; and this is not admissible. The bills of exception describe the evidence, of course, only as “ tending to show ;” but the instruction to ‘the jury answers the same purpose as a demurrer to evidence, and should be tested by the same rule. “A demurrer to evidence admits not only the facts stated therein, but also every conclusion which a jury might fairly and reasonably infer therefrom.” Parks v. Ross, 11 How., 362, (373); Richardson v. The City of Boston, 19 How., 263, (268). In accordance with this rule we. have to state the facts established at the trial.
At the beginning of the late war the State of Texas was the holder of certain bonds which had been issued to it by the United States under the act of Congress approved September 9, 1850, (9 Stat., 446.) During the war these securities were transferred by a certain military board to certain persons, for the purpose of enabling the State to carry on hostilities against the United States, and some of them were delivered to a firm known as White & Chiles, and *398 still remained within the United States; the residue had been delivered to one Swisher, and were by him sent to England, -where they were held, partly, by the house of Droege & Co., and partly by the Manchester Bank. The Supreme Court of the United States, by its decree in a certain litigation, established the invalidity of the transfer by the military board to White & Chiles of the bonds held in the United States. Thereupon Chiles set up title to all the bonds then held abroad, under a distinct contract made, as he alleged, between the military board and himself alone,, and served notice of his pretension upon Droege & Co. and the Manchester Bank. Neither of these parties claimed any title to or interest- in the bonds held by them, and the adverse claim of Chiles “ constituted the single obstacle- and impediment ” to their recognition of the right of the State of Texas to reclaim the securities. Meantime, after the decree of the Supreme Court against White & Chiles, and in the year 1873, Mr. Davis, then governor of Texas,, employed the plaintiffs to prosecute, in the United States. Court of Claims, a suit against the United States, in the name of the State of Texas, for the recovery of proceeds of the bonds which had been tranferred to England, upon a contingent compensation of 20 per centum of what might be recovered to the State by means of that suit. What was done with that suit beyond bringing it is not shown. Afterwards, on June 2,1874, a written contract was made between Kichard Coke, as Governor of Texas, and J. D. Giddings, and the defendant in the following words :
“The State oe Texas, Executive Oeeioe,
“ AustiN, June 2,1874.
“These presents show that J. D. and D. C. Giddings have been appointed agents for the State of Texas to pursue, by suit, all persons having claims adverse to the State of Texas to all or any part of the United States five per cent, bonds known as Texas Indemnity Bonds, which passed out of' the possessson of Texas, by means of the operation of the military board; the said J. D. and D. C. Gid- *399 dings being also authorized to compromise with said adverse claimants upon such terms as may be approved by the-Governor of Texas. It is further shown that said J. D. and D. C. Giddings are to receive, as compensation for their services, a contingent fee of ten per cent, for all sums of money recovered and actually received under their said appointment, by compromise, and are to receive twenty per cent, on all sums recovered and actually realized by suit and no more ; and said per cents, respectively, are to cover all costs and expenses and attorneys’ fees, whether accrued heretofore or to be incurred hereafter, so as to give the State of Texas all of the money so to be obtained, save and except-the ten per cent, and twenty per cent, aforesaid.
“Signed by both parties, the 2d day of June, A. D. 1874.
“.Richard Coke,
“ Governor of Texas.
“ J. I), and D. 0. Giddings.
“ Witness:
“ George T. Dashiell.
“W. W. Seueey.”
This contract was made by J. D. Giddings diming the absence of the defendant, who, upon his return, surrendered it to the governor, and on the 13th day of October, 1874, the following was endorsed thereon by the governor:
“Executive Oeeioe,
“Austin, Oct. 13,1874.
“ Whereas apprehensions have been expressed by J. D. and D. C. Giddings that, in consequence of outstanding contracts heretofore made with other attorneys, under which contingent fees are claimed, that if said claims are sustained the said Giddings might become liable to the State for any excess thereof above the 10 or 20 per cent, stipulated in the within contract ; now this endorsement is made for the purpose of declaring that no such liability by the said Giddings in said event was intended or contemplated ; and as, under outstanding contracts aforesaid, the per cent, for fees may *400 equal or exceed that stipulated for that purpose in this contract, it is hereby declared that said Giddings shall be paid in that event a reasonable per cent, of the amount realized by them on compromise, which shall be a just compensation for their services.
“ Riohard Coke,

“ Governor.”

It should be observed here, in reference to the question what attorneys or counsel were in fact employed, and were therefore referred to in these papers, that, neither on the 2d of June, 1874, the date of defendant’s original contract, nor at any time afterwards, were any others acting on behalf of or known to the State of Texas, in respect of these bonds, or of any proceeding affecting them, than the plaintiffs and J. D. and D. C. Giddings. On that date, June 2d, 1874, Governor Coke communicated to the plaintiffs his desire to appoint an agent for the State in respect of the bonds, provided it could be done without consuming too large a proportion of what might be received in attorneys’ fees, and his further wish that the Giddings might co-operate with the plaintiffs in securing a recovery for the State ; and on the 3d day of the. following September he advised the plaintiffs that, though the Giddings had been so appointed, with power to compromise and adjust controversies relating to the bonds, “they were but the outside aids of the counsel conducting the litigation, and were not designed to vary or interfere with the prosecution of such litigation by such counsel.”
Up to this point there is no evidence of any other employment of plaintiffs than that under the contract with Governor Davis, to prosecute in the Court of Claims the-suit against the United States for the recovery of the proceeds of the bonds, upon a contingent compensation of 20 per cent, of what might be recovered by means of that suit-These communications from Governor Coke recognize continued employment, and it may be claimed that they are evidence from which the jury might fairly have inferred a *401 mew and different employment. But it is to be observed tbat the terms of such inferred new employment are not shown, ■and that there is nothing from which it can be inferred that they differed from those of the contract with Governor Davis. It must be assumed, therefore, that if plaintiffs were already employed in September to conduct any other proceeding than the suit in the Court of Claims, it was upon a compensation contingent upon recovery by direct effect of such proceedings. As nothing appears to have been collected or recovered in this way, neither the original employment by Governor Davis, nor such inferred new employment by Governor Coke can make any figure in this case.
But it appears that afterwards in November and December, 1874, they were specifically employed on behalf of the State of Texas by Governor Coke, to conduct other and further proceedings in the Supreme Court of the United States, for the purpose of removing and avoiding the new pretension .and title set up by Chiles to the bonds held in England under the pretended contract between the military board and himself individually ; that at the time of this new employment Governor Coke was informed by the plaintiffs that nothing could be collected by process or execution upon any decree or judgment which might be obtained against Chiles under these further proceedings, but that the object and value of these proceedings would consist wholly in so binding Chiles as to prevent his further adverse assertion of claim to the securities, and in enabling the State, in consequence of such prevention, to obtain the bonds, or their proceeds, held in England. Accordingly, it was agreed in this new contract that, in case the State should succeed in obtaining the bonds so held in England, or their proceeds, by means of the aid and assistance which might be furnished through such further proceedings, about to be conducted by the plaintiffs, they should receive, for their compensation, twenty per centum of what might be so obtained by the State. Under this contract the plaintiffs did prosecute, in the Supreme Court of the United States, such further proceedings that, on the 29th day of March, 1875, by the judgment of that *402 court, Chiles was adjudged guilty of contempt, in setting up* claim to the bonds held in England, and ordered to pay fine of $250, and to stand committed until that fine' Was-paid.
Governor Coke requested the plaintiffs to communicate1 directly with him or with the Giddings in the course of' the1 conduct of said business, and plaintiffs did communicate witK'1 the latter, and the Giddings were informed as to all legal proceedings taken by plaintiffs, and urgently requested the ¡plaintiffs to take such action in the premises as would dispose-of the claim set up by Chiles, so that the obstruction of that-claim to a settlement with the holders of the bonds might be removed.
It next appears that the defendant,- proposing to go to1 England, and, if no settlement could' be1 had, to bring suits there against the holders of the- bonds-,- called on Governor Coke for funds to pay fees and costs of suit, and declined to' incur the costs and expenses of sueh an undertaking; when Governor Coke, replying that he had no money for that purpose, made the following proposition:' “ If you will go, and advance your expenses, costs, and whatever is necessary, and bring it to a close during my administration, I will see that you are paid a just and fair compensation, independent of all contracts; -but if you fail, I will not agree for the State to pay anything.” Upon the contract thus modified the defendant undertook the trip to Europe. On July 24th, 1875, he did go to Europe, for the purpose of effecting a settlement with the holders of the bonds; having, prior to his departure, been furnished by the plaintiffs, with a view to that end, with duly certified copies of the various proceedings conducted in the Supreme Court in relation to the bonds. He succeeded in collecting bonds, and proceeds of bonds, to an amount equivalent to $339,240]; and this collection was effected solely in consequence of the judgment obtained for the State in the Supreme Court against Chiles, for the contempt above mentioned.
Before his departure, the defendant was fully informed of plaintiff’s contract with Governor Coke, and that they *403 claimed, under that contract, 20 per cent, of what might be collected upon the bonds in England; and both before and after his return to America, the defendant promised the plaintifl's that he would hold, and not pay over to the State or to the Governor, the fund thus collected, until that compensation due plaintifl's for their services should be paid; and he informed the plaintifl's that the Governor had given, him the assurance that all fees might be paid from the fund1 collected, before the same should be paid to the State. A settlement, however, was made between defendant and Governor Coke, on the 21st of October, 1875, in the following manner: The Governor determined that, of the fund collected by defendant, the State should receive $300,000, and that the residue, $39,240, “ should be' dedicated and appropriated to pay all costs and char'ges, and all attorney and counsel fees that might be due by the State to the several counsel and attorneys engaged in the service of the State,” in respect of the bonds collected; and thereupon the defendant, at the Governor’s request, paid over to the State the sum of $300,000; and, upon the defendant’s request that the governor should determine what proportion of the residue the Messrs. Giddings should retain for themselves, the governor adjudged to them the sum of $31,240, and to the plaintifl’s, $8,000. The defendant retained possession of the whole $39,240 for some months, and then delivered $8,000 to the governor, still retaining the residue. In the end, the plaintiffs accepted the $8,000, and executed to the State a receipt in full for all demands against her. As counsel for the plaintiff's has suggested, the circumstances under which this receipt was required need not be stated here, since they make no figure in this case.
It is claimed by the plaintiffs that upon this evidence— which we have stated as facts only on the theory of a demurrer to evidence — two contracts are established, namely: 1st. A contract made by the defendant directly with the plaintiff's to retain and pay over to them the compensation for which they stipulated with the State; and, 2d. A contract made by the defendant in terms with the State, but for the *404 benefit of the plaintiffs; and that the-first of these is set up in the special count, but that a recovery may be had upon either of them under the common count alone, on the ground that both have been completely executed on the part of the plaintiffs.
The theory of the first of these contracts, insisted upon by the plaintiffs, is, that the evidence has established the following facts: First, an actual promise, made by the defendant some time in the year 1875, that he would retain and pay l over to the plaintiffs the compensation for which they had [^stipulated with the State; second, that the services rendered' by the plaintiffs in the proceeding against Chiles were the consideration by which this promise was supported, and that these services were a sufficient consideration, because they \ constituted a- benefit conferred by the plaintiffs on the f .defendant ■ at the defendant’s request; and third, that the' I promise was made with the consent of the State of Texas, i to which the moneys so to be held and paid over belonged.
The evidence — and on the theory of a demurrer to evidence, the fact — was that the defendant promised that he would “ hold ” the fund collected in Europe, and “ not fay it over to the State ” until the compensation due the plaintiffs should be paid, and that he informed the plaintiffs at the same time that the governor had given him the assurance that all fees might be paid from the fund. Rec., 16. A promise to retain the moneys of the State, and a promise to pay a pai't of them over to the plaintiffs involve widely different degrees of control over the fund, and the difference between them is important in this case. ¥e think that this record discloses no evidence on which a jury would have a right to find that the defendant undertook to do anything more than to hold and not pay over to the State the fund collected in Europe ; and that there is no evidence of a promise to pay over to the plaintiffs a part of this fund. Clearly there is no express promise to that effect, and we think there is nothing in evidence from which such a promise can fairly be inferred. An inference that he promised to pay over to them out of this fund, the fees for which they had *405 stipulated with the State, without an ascertainment and adjustment of those fees between the State and the plaintiffs, would be unreasonable, for he would certainly have no right to act, in disposing of the State’s moneys, upon the information given him by the plaintiffs that their compensation was to be 20 per cent, of that fund. The supposed proceeding necessarily contemplated a meeting of all the parties for the purposes of ascertainment and adjustment of the fees, and this, of itself, would define and limit the legal intent of the contract, and would show it to be a contract simply to retain the fund until the governor, by uniting with the plaintiffs in this settlement, should in effect consent hereafter that plaintiff’s fees should be paid out of the fund in defendant’s hands. And this again would show that the promise contemplated that such paymexft should really be made, not by him but by the governor of Texas. Now. if defendant’s promise was simply to retain the fund, his breach of contract would consist of failing to do so, and of paying it over to the State before plaintiffs’ fees were settled by the State ; and he would be liable only for the injury caused to the plaintiffs by such breach. That injury must arise from their consequent inability to collect their fees from the State. They have themselves shown, however, that they afterwards settled with the State, with full knowledge of the defendant’s violation of contract, and received the sum of $8,000, for which they gave to the State a receipt, “ acknowledging the same to be in full for all demands against the said State, in and about the recovery. of the said bonds.” Ve think that this settlement, although it may not affect their claim upon the other contract set up by them, does defeat any action upon this contract, as construed by us, for damages arising from defendant’s failure to hold the fund until plaintiffs’ fees should be paid.
It is next insisted that the services rendered by the plaintiffs in the proceeding against Chiles constituted a benefit conferred' by the plaintiffs upon defendant at his request,, and, therefore, furnished a consideration which supports the; subsequent promise.
*406 A somewhat curious and important question here presents itself, which, does not appear to have been well settled yet. If these services were in fact the very services which the plaintiffs were already bound to perform by virtue of a subsisting contract with the State of Texas, were they capable of serving as the consideration for any promise by the defendant, notwithstanding they might result, and did result,^ in a benefit to him? "We have examined several cases bearing upon this question. In Shadwell vs. Shadwell, Ex’r, 30 Law J. Rep. Com. Pls., 145, which was heard in the Common Pleas in 1860, the declaration stated that the testator in his lifetime, in consideration that the plaintiff' would marry E, N., promised plaintiff in the terms contained in the following letter: “ I am glad to hear of your intended marriage with E. N.; and as*I promised to assist you at starting, I ana happy to tell you that I will pay to you one hundred and fifty ■pounds yearly during my life,” &c. To this were added the proper averments to entitle plaintiff to an aotion. The executors pleaded that, before and at the time of the supposed promise, the said marriage was, without any request on the' part of the testator, but at the request of the plaintiff, agreed upon between plaintiff and E. N., of which the testator had notice ; that after this agreement the marriage was actually had at the request of the plaintiff and without the request of the testator, and that, except as expressed in the letter set forth in the declaration, there never was any consideration for testator’s promise. To this plea the plaintiff replied that the promise was in writing, setting out the letter in full, and averred that the plaintiff" afterwards married E. N., relying on testator’s promise contained in that letter. The case was heard on demurrer to the replication. It -was urged on the part of the defendant that the marriage was referred to in the letter as an obligation already incurred by the plaintiff; and that, therefore, the consideration on which the testator’s promise was based, was a consideration that the plaintiff should do what he was already bound to do, and that was not sufficient. Erie, C. J., and Keating, J., held that a sufficient consideration appeared. Byles, J., dissented. In delivering *407 the opinion of the majority, Erie, C. J., said: “ The consideration must appear in the writing containing the promise, that is, in the letter of 11th of August, 1838, and in the surrounding circumstances to be gathered therefrom, together with the averments on the record. The circumstances are that the plaintiff had made an engagement to marry E. N., his uncle 'promising to assist him at starting, by which, as I understand the words, he meant on commencing his married life. Then the letter containing the promise declared on is said to specify what the assistance would be, namely, one hundred and fifty pounds per annum during his uncle’s life ; * * * and a further averment, that the plaintiff', relying upon his promise, did marry E. N.” Byles, J., dissenting, said: “ The well-known cases which have been cited at the bar in support of the position, that a promise, based on the consideration of doing that which a man is already bound to do, is invalid, apply to this case ; and it is not necessary, in order to invalidate the consideration, that' the plaintiff’s prior obligation to afford that consideration should have been an obligation to the defendant. It may ha.ve been an obligation to a third person. The reason why the doing what a man is already bound to do is no consideration, is not only because such a considerations in judgment of law of no value, but because a mah can hardly be allowed to say the prior legal obligation was not his determining motive.”
The majority of the court forbore to discuss the" question^ whether the doing of an act which the plaintiff’ was already f bound to do was of itself a sufficient consideration for a/ promise by a third party, and clearly went on the grounds that other circumstances were so connected with and added! to this act, as to show that this was not the sole considera-j tion. Byles, J., excluded those circumstances, holding thatj the consideration was reduced to this act alone, and was, therefore, insufficient.
Two months .later the case of Scotson vs. Pegg, 6 Hurl. & N., 295, was heard in the Exchequer. The promise there delared on was in consideration of the delivery by the plaintiffs of certain coals from their ship. The defendant pleftdad *408 that, when he made this promise, the plaintiffs were bound' by a subsisting contract with another party to deliver these coals to their order; that he had bought the coals from that party who had given an order for delivery to him ; in other words, that the plaintiff was already under a subsisting obligation to another party to do just what he had done, and that, therefore, there was no consideration for his promise. This case also was heard on demurrer. It is evident from the opinions of Martin and Wilde, barons, that they assumed the existence of a further consideration beside the mere \ doing of an act which the plaintiff had already bound him-^elf to a third party to do. Martin, B., said: “It is cons sistent with the declaration that there may have been some dispute as to the defendant’s right to have the coals, or, it may be that the plaintiffs detained them for demurrage; in either case there would be good consideration that the plaintiffs, who were in possession of the coals, would allow the defendant to take them out of the ship. Then is it any answer that the plaintiffs had entered into a prior contract with other persons to deliver the coals to their order upon the same terms, and that the defendant was a stranger to that contract? In my opinion it is not. We must deal with this case as if no prior contract had been entered into.’’ And Wilde, B., said: “Here the defendant, who was a stranger to the original contract, induced the plaintiffs to part with the cargo, which they might not otherwise have been willing to do, and the delivery of it to the defendant was a benefit to him, f I accede to the proposition that,1 if a person contracts with another to do a certain thing, he ■cam' not make tfie performance of it a consideration fob a new"~~ promise to the same individoah But there is no authority ' for the proposition that whore-there.-haa.heen a promise to : one person ~to"~dd a'certain thing, it is not possible to ma|e“ '"aT'vali(í_p?;ómisfi’to anothet to do the same thing.” These tOpinions'i5ggésfi“'two-oBsefvafiofisr~~’When Martín, B., said that it was consistent with the declaration that there may have been some dispute as to the defendant’s right to have the coals, or that there may have been a claim for demurrage,! *409 and that the prior contract was no answer in that case, he plainly went on the ground that it was consistent with the declaration that there may have been a consideration beside the mere doing of an act which the plaintiffs were already bound to do by their contract with another party. The remark quoted from Wilde, B., indicates the same view. The other observation is, that his statement as to the possibility of a valid ■promise to a new party, that is, to the defendant, notwithstanding a prior promise to another person to do the same thing, indicates some inattention to the actual case before the court. If there had been any such promise', there would cleaiiy have been a sufficient, because a new consideration, moving directly from plaintiff to defendant. In that case the consideration for defendant’s promise would have been the perfprmance of an obligation of the plaintiff directly to him, arising at the same time and wholly new, and not of an obligation to another person still subsisting.
Mr. Frederick Pollock, in his treatise on the Principles of Contract, (p. 163), seems to suppose that this case involved a new promise by the plaintiff', and not merely the act of delivering on the strength of defendant’s promise. He says: “ In the case where the party is already bound to do the same thing, but only by contract with a third person, there is some difference of opinion. But there seems to be no valid reason why the promise should not be good in itself, and therefore .a good consideration. It creates a new and distinct right, which must be always of some value in law, and may be of appreciable value in fact. There are many ways,, in which B may be very much interested._in.A!s.^performing his conrracTwiWü) but yet so that the circumstances which give him affInterest in fact do not give _ him _any interest which ImWan'asSeft at law! It may well be worth his while to give something for being_év^Í^ftojráisi'mli,is_qwn right on the thiug heirig done. This opinion has been expressed and acted on in the Court of Exchequer, (Scotson vs. Pegg), and seems implied in the judgment of the majority of the Court of Common Pleas some weeks earlier.”
On the other hand, it had been held, more than a century *410 before these decisions, that even when the plaintiff “ under-tookf-’-at-the-defendanf^s request, to do an~acT^iroh-hQ-was . already under an obligation to another "party to "doTThe 'defendant’fi-promise — hr-consideration of that~undertakmg' .•was not binding. See Atkinson vs. Settree, Willes, 482. (A. D. 1744), as explained in, a note by LangdelL Lang-dell’s Select Cases on Contracts, p. 189. Subsequently, in Herring vs. Derrell, 8 Dowling’s Prac. Cases, 604, decided in 1840, it was held by Coleridge, J., that a promise made in consideration of_the_mere doing of an act which the promisee was "already under a legalNjbiigationNoa thTfcf" party to do, was without consideration:
We have found time to discover but few cases in this country touching this question. In Davenport vs. First Congregational Church, 33 Wis, 390, the court said: “It was proposed to show that the plaintiff agreed to surrender and discharge all his debts against the defendant providing the defendant would, within a reasonable time, pay its indebtedness to its former pastor; and the defendant accepted the proposition and, at a good deal of trouble and expense, raised the money and discharged that indebtedness. The only consideration for plaintiffs’ promise, upon these facts, was the payment by the •defendant of a debt justly due. It might cause the defendant some trouble and inconvenience to pay its debts, but we are not aware of any principle of law which would make such payment alone a sufficient consideration for a promise on the part of its creditor to release his claim.” So, too, in Johnson’s Adm’r vs. Sellers, 33, Ala. 265, it was held that a promise by defendant to plaintiff’, made to induce the latter to comply with an existing contract between him and other persons was without consideration.
The rule established by these authorities is, that a promise made in consideration of the doing of an act which the promisee is already under obligation to a third ■party to do, though made as an inducement to secure the ¿loing of that act, is not binding because it is not supported by a valuable consideration. We conceive this to be el&irly true when the act done on the part of the promisee *411 involves nothing more than performance of the original obligation toward the party to whom it was due. On the other hand, if the promise be made in consideration of a promise to do that act, entered into directly with the promisor, as indicated by Mr. Pollock, or in consideration that some dispute is thereby determined, or that some right is waived, as suggested by the remarks of Martin, B., in Seotson vs. Pegg, then the promise is binding, because not made in considera-i tion of the .performance of a subsisting obligation to another] [person, hut upon a new consideration moving between the ¡promisor and promisee! W e do not perceive that Shadwell vs. Shadwell or Scotson vs. Pegg are opposed to this view; ■though some observations were thrown out by the learned .judges during^tife argument which we cannot reconcile with it, and which we cannot assent to. /
We think that the consideration on which this defend-■ant’s promise to the plaintiffs is alleged to have been founded is governed by the rule which we have stated. It is claimed/ that the services rendered by the plaintiffs in the proceeding against Chiles, in tlie'feupreme Court of the United States, were rendered ¿t tjm request of the defendant, and constituted the consideration for his subsequeht promise.
But it appears that, at the time when they are said to have carfied on these proceedings at his request, they had already been retained by and were under a legal obligation to the State of Teaxs to perform these services; and it is not shown that they prqgiised the defendant that they*]/ would continue them, or thaij^they were induced by defend- j ant’s request to determine any dispute a’s‘ to their obligations, or to waive any claim. In_a word,.no’Other consider.- , ation for any,promise by the defendant, than the perform-^ anee of what they were legally bound to perform by a subsisting contract with another party, is shown;; and the plaintiffs have shown on the other hand, in their own behalf, that they actually did perform that act under their prior contract. We hold that these services could npk_serve as a consideration for any promise by the defendant, evenTlfNt had been made at the tiftie of the requestTfor their perform- *412 anee. It may be added that, even if they eonld serve this purpose, they are not shown by any evidence to have been, as a matter of fact, the consideration on which the promise here insisted on was based. What the consideration for a promise was, is a matter of evidence, and this consideration is not shown to have been referred to, or to have been in the minds of the parties. We know of no principle which would have authorized a jury to assume, in the absence of affirmative proof, that some past benefit, conferred at a party’s request, was intended to serve as a reason or consideration of a subsequent promise, whose terms in no way referred to it, merely because it was an event which had once happened between the same parties. The antecedents of parties are not to be sifted for a consideration.
Again, it should appear in some way that these services were in fact rendered in consequence of defendant’s request. If the plaintiffs were already bound by their contract with another party to perform them, and were actually performing them at the time of defendant’s request; in other words, if they were already moved by a sufficient legal cause, the mere fact of a request by a new party is not evidence that they were caused by that request; and this record discloses no other affirmative evidence tending to show that the plaintiffs did in fact act upon that request. Indeed, by showing, in their own behalf, that they obtained judgment against Chiles under their contract with the State of Texas (Rec., 15), they have shown that they did not act upon defendant’s reqnest.
But if it had been shown that these services were in fact contemplated by the promisor as the consideration of his promise, and that they were in fact rendered in consequence of his request, and if it should be conceded that they might serve as a valuable consideration for some promise on his part, notwithstanding the plaintiffs were under a prior subsisting obligation to another party to perform them, we should still be confronted with the question, whether the particular promise here insisted upon can be supported by that consideration. We think that the contract here set up *413 cannot be built upon that foundation. If plaintiffs’ services in the proceedings against Chiles can be regarded as a benefit conferred by them on the defendant in consequence of his request, and as a consideration for" some promise on his part, it would follow that the law at once -implied a promise by'him (since he made no express promise at the time), to pay for the services which he thus caused, what they were reasonably worth.
The contract between the plaintiffs and the defendant in relation to those services, would in that case be complete and closed up. In that contract the services would stand as the consideration for a perfect promise, although that promise would be established only by implication. Now, it has been established that, where a past consideration, that is, a thing previously done by the plaintiff at the request of the defendant, is one from which the law implies a promise, a subsequent express promise different from, or in addition to, that which the law implies, is nudum pactum. Among the authorities in which this doctrine is recognized are Brown vs. Crump, 1 Marsh, 567; Granger vs. Collins, 6 Mes. & W., 458; Roscorla vs. Thomas, 3 Q. B., 234; and Bradford vs. Roulston, 8 Irish Com. L. Rep., 468. If this were not the rule there would be two distinct and perhaps antagonistic promises resting upon one consideration. "We suppose that it is not necessary, in applying this principle to the case before us, to demonstrate that a promise to retain out of a fund belonging to the State of Texas, and pay over to the plaintiffs, a compensation due them from the State of Texas, is different from an implied promise of the defendant to pay the plaintiffs himself, and out of his own moneys, the value of services rendered at his request. JVe must hold j under the authorities referred to, jthat plaintiffs) services cannot in this case serve as a consideration for the subse-, quent express promise insisted on. If a consideration at all, they had already carried one promise and will not carry another.
Finally, as to the assent of the State to this contract, by which its fund was to be disposed of. It is claimed that the *414 Giddings had, by virttié oí their Contract of June- 2ñ^ 1874', with Governor Coke, a lien üpOft this fund for the^purpose,, among others, of paying Out of it the plaintiffs’"' fé'es, andl that the law implied the consent of the State to an-act which"', would execute the purpose of the lien. In this-.way the- assent of the State to the contract under consideration is said i to bo itoade Out. Wé think that the provision• referred:to > neVOir had the effect claimed for it, and that; .even- if if-might bé'áir ‘‘such á construction it was rescinded ‘ before it could leild any Support to this later contract:. But as it' forms the basis’of the second proposition presented to us;, the questions'of its effect and of its rescission: will b'e considered under that head.
This second proposition is, that a contract' was made by the defendant, in terms, with the State,.but'fOr the benefit of the [plaintiffs, and that by virtue of'this contract he is bound to pay their fees, at least to the. extent. of' the compensation allowed to himself.
The contract of June 2d, 1874, sets .forth .that J. D. and' D. C. Giddings were appointed agents for .the State of Texas, '“’to pursue by suit all persons having;claims adverse to the :State of Texas,” to the bonds in question ; and, after stating their compensation and authorizing them to proceed also .by compromise, it provided that their, percentage were “ to cover all costs and expenses and attorneys’ fees, whether accrued heretofore or to be incurred hereafter.”' It is not claimed that plaintiffs’ fees had “ accrued heretofore,” or that any fees have been earned under.the then outstanding contract with Governor Davis, made in. 1878, by -which they were to be entitled to twenty per cent, of what might be recovered to the State by means of the suit against the United States. The basis of their claim is the contract with Governor Coke, made in November or December, 1874. The-question, therefore, is, whether the provision relating to attorneys’ fees “ to be incurred hereafter,” meant that the Giddings were to pay out of. their percentages whatever fees the State should subsequently choose to contract to pay to attorneys for services in. respect of these bonds. On re- *415 burring to the first clause of the agreement, we find that they were to pursue by suit all persons having adverse claims» It was contemplated, then, that they should employ attorneys, and to the fees of these attorneys, at least, the clause relating to attorneys’ fees to be incurred hereafter, would apply. Was it understood that the same words should apply to attorneys employed, not by these agents and in suits which they should cause to be brought, but by the State ; and that the compensation of these attorneys, over which they could have no. control, and which might, as: the compensation claimed by the plaintiffs undoubtedly would, sweep away the whole of their own percentage, should be paid out of these percentages ? We think that an intention which it would be so improvident and even absurd for them to entertain, is not to be gathered from this provision, when it may be satisfied by another and reasonable appli-. cation.
This is a familiar test in ascertaining the intention of statutes and contracts. It is to be observed, moreover,.that this instrument provides for a particular, and what on its,» face would seem to be a complete agency, by means of which' suits should be pursued or compromises made ; and that it contains no express indication that the State» intended to employ, or reserved the right to employ, any other agency, and at the cost of the Giddings. In vie*tf of this general purpose of the instrument, and of' the” omissions of such an express provision, we think itjas inadmissible to apply the clause in question to the fens of the attorneys afterwards employed by the State, independently of the agents. We are aware that the record shows that the State did in fact afterwards make ñ contract with the plaintiffs for services and compensation, but that fact does not construe this agreement ; it must be construed by its own terms and by the circumstances existing at the time of its execution. And if we are to look to any construction given by the parties, it appears that they both construed and modified the original contract, before the defendant was -willing to act under it, by the indorsement of October 18,1874. The terms of thig *416 indorsement clearly indicate a purpose to prevent undue, liability on the part of the agents, and to secure tó tliem a reasonable compensation, in case their percentages should be swept away by the charges laid upon them; and yet for this purpose they provided only for the case of those percentages being absorbed by claims under “ outstanding contracts.” The parties plainly assumed that these were the only source of damages, and it is not intelligible that they should have understood that the object of the indorsement might yet be defeated by contracts which the State should choose to make with other persons. As this indorsement was made before the defendant would consent to act under his appointment, the two papers must be construed as one instrument ; and, when so construed, they exclude any application of the clause in question to the fees of attorneys afterwards retained by the State.
But, if even the original contract had contained a promise to the State, that the Giddings would pay plaintiffs’ fees, those parties had a right to modify or rescind it at any time before the plaintiffs made themselves privies by accepting and acting upon it. Trimble vs. Strother, 25 Ohio St., 378; Davis vs. Calloway, 30 Ind., 112; Durham vs. Bishoff, 47 Id., 211; Thorp vs. Coal Company, 48 New York, 257. And it appears that the State and its agents did in fact agree upon a new basis and method of compensation-, while the' original contract was thus open to modification, and that, under the new arrangement the defendant could have no connection with plaintiffs’ fees.
It was agreed between the defendant and Governor Coke, that, if the defendant would go to Englaud, and pay all costs arid expenses incident to the collection of the bonds there held, and should collect them during Governor Coke’s administration, he should have a fair compensation independent of all contracts. We think that by this arrangement the original terms of compensation were essentially altered. Under the original contract the defendant was to have reasonable" compensation in case his percentages should be exhausted by the charges laid upon them; but that cumbrous arrangement *417 was superseded, and the defendant was now to work simply for a reasonable contingent compensation “independent of all contracts.” Whatever compensation he was now to have was to come to him in that character, and of course exempt from any charge for the benefit of the plaintiffs ; inasmuch as a fair or reasonable compensation subject to be consumed by charges is an unintelligible conception. With these views as to the intent of the original contract, and of the effect of the final modification, we must hold that the compensation actually received by the defendant did not constitute a fund out of which he was bound to pay fees to the plaintiffs, or money received for their use. We think, therefore, that the court below was right in directing the jury to find a verdict for defendant upon both the special and common counts;
Judgment is accordingly affirmed.